May it please this honorable court, counsel. Your honors, I represented Jenette George, a person who made every effort to develop a legitimate marketing business and her activities were legitimate and should not be found to I have two arguments to make and I made them at trial, a bench trial. What she did was not illegal and if someone were to think it was illegal then she did not violate the statute which requires an element of willfulness because it's both complex and it's broad. So Mr. Clavelli, I can understand that people in might not understand why the anti-kickback law forbids paying per patient referral but I thought Ms. George did even testify that she got $500 every time a patient she referred was admitted or readmitted and I also would like you to address the fact that even though other people may be in the certify that's not enough to relieve somebody of their responsibility under the law. If you're, well your honor I don't think the law is that clear certainly Miles, the Miles case which I'd like to talk about a little bit later they received $300 per patient. It's and you know this is not just about the amount of the remuneration because that could always be adjusted civilly during an audit. It's about should she have gotten paid or not and both agents testified that her services were legitimate and she was entitled to being paid. Now I want to go right to the heart of your honor. Mr. Clavelli was the trial court just wrong when the trial court found that when she was arrested she stated that she began receiving payments in cash you know in around November 2011 and that she was paid $500 per patient and that she realized that it was illegal to be paid per patient. I mean that alone it would seem would be sufficient uphold the conspiracy conviction. I mean what was the trial court wrong? I guess I'm gonna have to say that the trial court a person that I was wrong in this instance and if you'll allow me to explain and to also answer your first question. Both Miles and the Patel case from this circuit have a statement which is what is the purpose of the anti-kickback statute and according to both of those cases the purpose is to ensure that the doctor uses independent judgment and that the patient care is not compromised. Now the Patel decision goes a little further but the focus is on the doctor. The doctor is in control and is in control because they certify. So for instance in Patel the doctor got paid for his examinations and all the legitimate things he did and which led to a certification of Medicare services and then got paid $500 I think per patient just because of the referral. Well my client didn't get paid for her referral she got paid for her marketing activities which were extensive and that's the same with the Miles case. Isn't she the one who identifies these people for at least she weaves through a lot of people. She has marketing services she weaves through a lot of people she sends you know a few over and then the doctors certify you know half of that I think like a hundred over and 50 are certified or you know 94 over. I actually wanted to talk about that so she sent out thousands of mailers spoke to hundreds and hundreds of people telling them they may have they may have benefits which they can claim. How many of them went to other doctors or other service providers who knows. But here 90. That's not what she got indicted for though the mailers. Here 90 came to her she spoke with them she probably spoke to a lot more but 90 she felt qualified elderly and were homebound. So she refers them to Rosner. Rosner sends out a doctor and on 55 of the 90 only 61% the doctor agreed and certified. So clearly she is not the relevant decision maker because the doctors acted independently and the premier people did in miles recommended this service provider they could have gone anywhere once they've got the doctor's prescription. Now let me address Judge Rosner's comment about she admitting. There's four important events here. In November of 10 she gets a written contract which says in the email it's in the appendix D this contract is more legally sound. A couple months later she sees this book online and she sends an email saying she's concerned. Then starting in March of 12 the cooperator starts recording her and he waits all the way until July 13 to say why do you want checks? Well a person that willfully wants to violate the statute they don't accept checks and you won't find another case in the system where kickbacks are paid by checks. Only in this case. So she says well. She gets cash too sometimes. Oh yes oh yes and the cash began before November of 11 began in March of 11 and she said it raised a red a red flag but Hurnell she counted on Hurnell and he said you have a contract it's legal. So then on a week later she goes there again and he says well did you consider what I said about taking checks in addition to cash? Do you want to you know you're leaving a paper trail do you want to still take checks? And she says yes I want checks. Her last three payments were checks. Now a week later she's arrested and they say to her did you know that it was illegal to be paid per patient? Well Hurnell had just told her it was illegal to be paid per patient. July 13th he comes right out and tells her that. She's the question is did she know it was illegal to be paid per patient which I maintain it's not in April and May which are the two substantive counts. I don't know how you can say that it isn't though. I mean I just looking at the language of the statute it seems that that's just one of the district judge doesn't buy them either one of the employee right and the other is the underserved areas but that there's no evidence that they've actually jumped through the hoops to be an underserved area. Well the language is volume and value. Well she got $57,000 for her people were at 114 start of cares $500 per the 90 people and Rosner got five hundred and twenty some thousand for her referrals. Clearly was not based on value which is what happened in Vernon when they got the patient advocate got the percentage and didn't do anything to earn it. Just like in Pullen the salesman got $50 for giving it to a service provider because he could do it because the doctors let him do it. He didn't do anything to earn that 50 where she did a lot of work and earned her 500. But where in the statute that it's does it say you can be paid per patient as long as you're providing real services per patient? The safe harbor. Well personal services safe harbor the contract which was written by Rosner's director of marketing who did not appear as a Well you know she is the only one they had this contract she is the only one that got paid by check and the check stubs which were found in Rosner's offices said business promotion marketing expense. So how could it not be a legitimate cost of doing business? Well again she's you know she's being paid by the patient I'm looking at the medically underserved safe harbor and maybe she could have produced that maybe there was evidence that this was a federally qualified health center but that's a specific statutory thing and and I don't see where this is a personal service contract that does not take into account volume of referrals. It's a referral agency it's a marketing agency. Well that's the problem it's not but it's and if all she did was market you know then maybe it would be a different case. Well you're marketing on behalf of a client just like Premier marketed on behalf of the service provider in miles. But her compensation isn't just some fixed fee that Rosner pays her at the end of the year for being their advertising agency. It was set in advance it was fixed it was fair market value which is what one of the emails said by her now this is what all the agencies pay and who is going to pay somebody for sending out mailers and talking to people that never produces a client? They'd be like paying a salesman for showing up who doesn't sell any cars. No one's going to do that. It's a piecemeal business and how can you make a crime based on how the client is? Should they have gotten any money at all? And that's what all of these cases say. Pullen shouldn't have gotten the $50. The patient advocate shouldn't have gotten the percentage. And Shoemaker distinguishes miles but does not overrule it. It narrows I mean people had kind of taken miles and run with it and Shoemaker comes along. It definitely narrows it. That's too much. We are right there with miles. The only thing is that my client spoke with the patients where the miles people spoke with the physicians but both of them are before any certifications and they don't impact or influence the doctor's decisions. They create the pool of people from whom the doctors are choosing. In that sense they've influenced it already. So your honor, as I said I believe that she showed by wanting a written contract, by saying she preferred checks, that she wanted to do legitimately and thought she was until this July 13th when as my client says on tape to her now who says well you know you can't do this you're not an employee you can't get paper patient and she says well you're sending me mixed signals. Well what does that mean except you're talking you're giving me double talk. First you're telling me it's legal as can be. Now you're telling me it's not and she never makes another referral after July 13th. If you'd like to save a few minutes for rebuttal that would be fine. Thank you judge. But I think the only point the government is going to make is that really is that she made the admission and the admission only goes back to July 13th. Prior to that she was never asked in April and May of 2012 when you were I thought it was legal. Thank you. Okay. Thank you. Mr. Lee. May it please the court. My name is Stephen Lee. As the district court concluded in its opinion denying the defendant's post-trial motion, the evidence here was sufficient for a reasonable finder of fact to find the defendant guilty as the district court had done in its opinion. The elements of the anti-violating the case showed that evidence showed that the defendant knowingly and willfully received remuneration from Rosner in return for her sending patients to Rosner. So why shouldn't it now give... On numerous occasions she appeared to try and conform her actions to the law and try and gain assurances from her now that her actions were lawful. Given that he was working, you know, acting on behalf of the government at some point, is this similar do you think to the safe house robbery cases where a crime is manufactured or at least furthered rather than avoided? No, Your Honor. I do not think it's like the safe house cases and I think it might be helpful to step back and consider the chronology here because I think defense counsel made some mistakes in explaining how events unfolded over the course of the scheme and the government's cooperator. I think it's important to note that there are two key periods here. There's the period initially when the defendant began working with Rosner when she got the contract in November 2010 and when she sent that email to Gary Harnall in March 2011 about the concerns she had developed about the legality of their conduct. And up until that time, I think it'd be difficult for the government to show that she was acting willfully in that particular period. The problem is that whatever happened at that time, even if Gary Harnall had provided assurances to her in March 2011 that their conduct was legal, the defendant herself admitted that when she started receiving cash payments from Rosner sometime after March 2011 and before late 2011, she knew that what they were doing was illegal and she kept doing it. So she knew by late 2011 that their conduct was illegal and she continued to do it nonetheless. And she was continuing to do this when the government began recording in March 2012 and she continued to accept this money and to expect this money even after that July 13, 2012 recording. Now, defense counsel misrepresented some of the facts of that July 2013, 2012 recording. He said that the defendant wanted, that the discussion was about how the defendant wanted all the payments in cash. I'm sorry, that she wanted the payments in checks and that she talked about that in the recording. The recording transcript is actually very different. She says when referring to the payments that it could all be in cash and that she wanted the payments in cash, it's just that Rosner wanted to pay her in check. So it's very different from what defense counsel represented. And tellingly, by the conclusion of that recording, it was clear that there had been discussion where both sides knew that what they were doing was illegal and then she continued nonetheless. That wasn't the last recording. There were additional recordings, additional discussion of her receiving payments on a per patient basis for the patient she had referred. So the chronology is very different than what defense counsel represented and it shows that even if she did not act willfully in that early time period, 2010, early 2011, she was acting willfully by the time of each of the counts of conviction and that she knew what she was doing. She was acting willfully by late 2011 onwards. So in terms of the Miles case, defense counsel talked about that case. I think there's some key distinctions again between what was going on in Miles and what was happening here. Now the Miles case, first of all, that involved a marketing company that simply showed up to doctor's offices and dropped off advertising brochures about the services of the home health agency it was marketing on behalf of. So I take it it's the government's position that if she got paid some number, some amount of money per year for scouring doctor's offices or dropping off brochures about their agency in the population, this zip code or whatever, that all would have been fine. I think that would be much more like what happened in the Miles case. That would be more like just simply advertising activities. But rather than... So what about though, I mean how literally does the government take this notion that there can't be consideration of the volume of patients or the volume of users of the home health service or what have you? Anything at all related to volume? Like yes, your get some interest or what? Well, I think under the Miles decision, it is not so much the volume, it's the volume tied to the referrals. That's right. So the patient, the payments don't violate the act because all they're doing is giving the materials to the doctors and connecting the doctors and the agency when the doctors reach out, right? Yes. In the Miles case, the doctor was the one who made the decision, oh, my patient might benefit from home health services. Oh, I will send them to this agency that I just received a brochure of. So why isn't that very close to what happened here? 90 people, after she scoured through them, show up. The doctors don't just rubber stamp it. The doctors could have said two people out of the 90 were good candidates for the services that this play here. The first decision and the one that the defendant did have control over is which agency the patient would go to in the first place. This is not a situation where the defendant talked to the patient about talking to her doctor about whether home health services would be useful and to consider Rosner. This was the case where, as we saw from the one patient who testified at trial, the defendant got the patient's name, the defendant made the choice about which agency was going to come. She didn't make a decision about this. So the defendant was the one who made the decision, the first decision about which agency would get the patient. That agency then got a doctor to sign off on the that's a different issue. But if she hadn't been paid by the patient, I mean at some level I feel so. We're talking about these elderly, homebound, maybe partially suffering from dementia people. Isn't it very fictional to think that they couldn't use an expert recommendation about a home health service? Yes, Your Honor. Why is that terrible? Your Honor, the patient could have her own doctor. That if patients have doctors, patients should be turning to medical professionals to make these decisions based on the best interests of the patient. They shouldn't, the whole point of the anti-kickback statute is to protect that relationship. Sounds like a doctor cartel statute. Do doctors have time in their in their conferences with and examinations of patients to engage in that kind of counseling anymore? I don't know, Your Honor. It depends on how the what the doctor relationship with the patient is and how it's funded and what kind of time pressure is put on the doctor and so on. You're offering a model of counseling that may be more the exception than the norm these days. Your Honor, the point of the anti-kickback statute, one of the purposes is to prevent fraud, waste, and abuse. The point, the whole point of the system and anti-kickback statute is to try to keep these undisclosed financial incentives from shaping things and which leads to waste and abuse. I thought that the point of the statute was to say that if whoever the referring person is, the charge, is getting people to go based on money versus based on medical need, then incentives are out of line. We want people to get effective medical care. Now this may be a very romantic view of the way the medical profession works these days, but I thought that was the notion that you didn't want doctors saying, you know, I'm taking I'm referring you here because I'm going to get a kickback whether it's for physical therapy or whether it's for home health care or whether it's for anything else. You want the doctor to be deciding on the merits and this is one tool that the government has adopted. Yes, Your Honor. Counsel, could I ask you to address just one point made in the appellant's brief which was apparently you relied at least to some degree on evidence about what Ms. George said to agents at the time of her arrest and the appellant's brief says that the agent did not make a report of the George interview nor take any notes of that interview. Is that right? No, Your Honor. There was a report of that which is, in terms of the notes, I don't recall myself if, I don't recall myself if we necessarily, if the defendant necessarily requested those notes. Was the report admitted in evidence by any chance? I don't know if the report was admitted in evidence, but the report was produced. Okay, thank you. Yes, and Your Honor, one counsel talked about how the compensation that defendant received was not fixed. That's incorrect. She was paid on a per patient basis. That was the arrangement throughout the time of her arrangement. What about all this cross-examination based on the ultimate guide? There's a complaint in the record about that. Isn't it a little heavy-handed for the prosecutor to stand there, I don't know if it was you or somebody, but stand there and read off excerpts of this thing? Was the whole book introduced or just these excerpts? Your Honor, the defendant herself on her, in her case, on her direct examination, she introduced and admitted to evidence the whole book. And she testified that she had, in the evidence that she presented, was that somehow she had read parts of the book enough to have concerns about the legality of what she was doing. And that's what sparked the email in March 2011 to Gary Hernal. And the government, nobody wanted to call Hernal. The government doesn't call Hernal. She doesn't call Hernal. Why is that? Your Honor, the government made the decision not to call Gary Hernal, but also the defendant made the decision not to call Hernal. He was available to both sides. Either side could have called him. Neither side chose to call him. And did not abuse his discretion in not considering him a missing witness. And I think partially, part of that is this. Even if they had considered, the court had considered him a missing witness, the only issue that Gary Hernal could have supported the defendant on is this idea that in March 2011, he did provide some assurances to her that their conduct was legal. Now, even if he had done so, she admitted that later that year, by late 2011, she knew their conduct was illegal. So there would have been no effect, even if he had testified to the extent that the defendant would have liked. Once the court has any further questions, the government asks you to affirm the conviction. All right, thank you. Mr. Covelli. Thank you for giving me a few minutes. I'll simply respond. Agent Krauss did not make a report. She made no notes. She didn't read the agent's report who was there. Agent Krauss, the only one to testify who was there, relied strictly on her memory. But somebody else did? Somebody else made a report. So there is a report of that meeting. There is. So there's some attendee whose name I don't remember, if I ever knew it. Yes, there's a report. And you had that report available to you to cross-examine? No, I couldn't because she didn't adopt it. She didn't read it. You could use it to cross-examine, right? No, I could not. She did not adopt the report. She did not read the report. She was relying... Could you have called the other... could you have called the person who prepared the report? Yes, I could have. Okay, so what's the problem? Well, I don't like saying that. My brief is misleading when it's accurate. Well... I'm sorry, I'm a little sensitive about that. I appreciate that and perhaps I read too much into your assertion that Agent would have... I understood that to mean that there wasn't a report, but you've cleared that up. Thanks. Thank you very much, Your Honor. And the July 13th tape, he says, why do you insist on checks? And she says, well, not that I insist. You can give me all cash. She says, I'm going to report it anyway. But then on the 19th, there's no question. He says to her, did you consider what I told you last week? And she says, no. No, I did not. I do not want to change. I still want checks. It's clear as a bell. And as far as the unique guide, the only reason for that was to show that she was trying to follow the law. She goes online. She buys this book. The first chapter is all about the law. It's gobbledygook to her. The other 350 pages is all about how to run a marketing outfit. And she gets ideas from there. And she testified. I went through the index. I was a little concerned, but, you know, I didn't really... I don't really... and it was five years earlier. I mean... All right. It just goes to her good faith, Judge. All right. Thank you very, very much. Thank you, Judge Rovner. And you are appointed by this court. Thank you very much. Thanks as well to the government. We'll take the case under advisement.